## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK; STATE OF
ILLINOIS; COMMONWEALTH OF
MASSACHUSETTS; STATE OF
CALIFORNIA; STATE OF MINNESOTA
STATE OF COLORADO; STATE OF
CONNECTICUT; STATE OF DELAWARE;
STATE OF HAWAI'I;  STATE OF
MARYLAND; THE PEOPLE OF THE STATE
OF MICHIGAN; STATE OF NEVADA;
STATE OF NEW JERSEY; STATE OF NEW
MEXICO; STATE OF OREGON; STATE OF
RHODE ISLAND; STATE OF VERMONT;
STATE OF WASHINGTON; STATE OF
WISCONSIN,

   Plaintiffs,

 v.

**U.S. DEPARTMENT OF EDUCATION**,
**LINDA McMAHON**, in her official capacity as
Secretary of Education, **CRAIG TRAINOR**, in
his official capacity as acting Assistant
Secretary of the Office for Civil Rights,

   Defendants.

No. 25-cv-11116

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1

## INTRODUCTION

1.      Each year, the United States Department of Education ("ED") provides States with billions of dollars of Congressionally-mandated financial support for a wide range of critical programs and services, including ensuring that students from low-income families have the same access to high-quality education as their peers, providing special education services and accommodations, recruiting and training highly skilled and dedicated teachers, funding programming for non-native speakers to learn English, and providing support to vulnerable children in foster care and without housing.  As part of the ordinary administrative process around receiving such federal funds, State and Local Education Agencies ("SEAs" and "LEAs") routinely provide written assurances that they will comply with Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, or national origin, as a condition of receiving this financial aid. As described more fully below, each Plaintiff State has abided by its statutory obligations, including by providing these assurances via certification.

2.      Defendants have acted to unlawfully imperil more than $13.8 billion that are spent to educate our youth.[1]  Plaintiff States rely on these funds, and they would be unable to replace the federal funding from another source. The results would be catastrophic for Plaintiff States' students from kindergarten through high school.  For instance, loss of special education funding would devastate schools and districts' abilities to serve students with disabilities.

3.      On April 3, 2025, ED departed from a longstanding and statutorily-mandated process by directing SEAs and LEAs to complete a novel and unlawful certification that would

---

[1] This calculation is an underestimation, as it represents an accounting of just two categories of federal funds that are the subject of this dispute, specifically formula federal Title I funding and formula federal funding pursuant to the Individuals with Disabilities in Education Act ("IDEA"), described more fully below.

also place excruciatingly difficult burdens on Plaintiff States ("April 3 Agency Action"). Specifically, the certification and its accompanying email directive imposed new onerous conditions on Plaintiff States in order to continue to receive these federal funds, including by putting them in a vulnerable position to indicate agreement with ED's new, vague, confusing, and incorrect interpretation of Title VI with respect to diversity, equity, and inclusion; requiring the SEAs to affirmatively investigate whether LEAs are supporting or providing for diversity, equity, and inclusion in their schools; report on every LEA's compliance with ED's unsupported position that "certain" undefined diversity, equity, and inclusion programming, instruction, and curriculum is prohibited by Title VI; and develop plans to align every LEA with the ED's new, ambiguous, and unsupported interpretation—all within a matter of days.

4.      Through this unlawful certification demand, ED implemented a broad directive issued by the new Administration through a series of Executive Orders (the "Presidential Directive") to eliminate a category of diversity, equity, and inclusion school programs it does not define, but which it claims constitute illegal discrimination under federal law.  For instance, upon taking office, Donald Trump issued Executive Order No. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," 90 Fed. Reg. 8633 (Jan. 21, 2025) and Executive Order No. 14151, "Ending Radical and Wasteful DEI Programs and Preferencing," 90 Fed. Reg. 8339 (Jan. 20, 2025).  President Trump has added still more executive orders on this topic as described below, including Executive Order No. 14190, "Ending Radical Indoctrination in K-12 Schooling," 90 Fed. Reg. 8853 (Jan. 29, 2025).

5.      Although termed in a variety of ways across these executive actions, the Presidential Directive has two basic components.  *First*, the President deems many, if not all,

diversity, equity, and inclusion[2] programs—whether commonly understood as DEI programs or falling within the administration's unspecified guidelines—unlawful under federal civil rights law. The President has reached this conclusion by way of an unsupported expansion of the Supreme Court's interpretation of Title VI in the college admissions context in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) ("*SFFA*").  **Second**, President Trump instructs agencies to punish institutions that have such purportedly unlawful programs by withdrawing federal funding immediately, including K-12 schools.

6.      By its April 3 Agency Action, ED implemented that Directive in a manner that is unconstitutional and otherwise unlawful.  This implementation also sets up Plaintiff States to lose their federal funding and threatens other punishment notwithstanding their certification of compliance with Title VI.

7.      ED's authority to interpret and enforce Title VI is statutorily prescribed. ED can only engage in enforcement and withholding based on rules that have gone through the notice and comment process. 5 U.S.C. § 706(2)(D).  Even then, it can only withhold funds after completing an extensive iterative process, including conducting an appropriate, unbiased investigation; making a determination that an SEA or LEA is not in compliance with Title VI and its implementing regulations; offering an opportunity for an SEA or LEA to review a findings letter; engaging in a voluntary resolution process;  notifying Congress; and waiting 30 days. 42 U.S.C. § 2000d-1.  But it cannot, as here, weaponize an intentionally vague, unlawful interpretation of Title VI through wholesale and sudden termination of federal funds against Plaintiff States that cannot

---

[2] DEI often includes concepts that also relate to accessibility, allowing for the more precise acronym "DEIA."  These acronyms are used interchangeably herein.

lawfully or practically comply with unprecedented agency demands, and without following the aforementioned procedural requirements.

8.      In response to the April 3 Agency Action, Plaintiffs re-affirmed their already existing certification of compliance with Title VI and its lawfully issued implementing regulations and pointed ED to the valid and current in effect certifications already in ED possession.

9.      However, Plaintiffs declined to certify compliance according to the terms of the April 3 Agency Action because that Action was contrary to law, unlawful, unauthorized, and unconstitutional.  As a result, Plaintiffs face the immediate withdrawal of federal education funding, both by the stated terms of the April 3 Agency Action and consistent with the Administration's actions with respect to other educational institutions across the country.

10.     To be clear, this case does not challenge the federal government's ability to lawfully enforce Title VI. The extraordinary April 3 Agency Action, implementing the Presidential Directive, is not lawful Title VI enforcement.  Rather, the April 3 Agency Action is subjective and illegal punishment for not acceding to an agenda to eliminate diversity, equity, and inclusion of any kind in schools—even though federal funding and civil rights statutes require public education to be open and welcoming to all regardless of protected characteristics, and inclusive and equitable, especially for those students who have disabilities and need accommodations.  Plaintiffs here seek declaratory relief that the April 3 Agency Action is unlawful and unconstitutional and injunctive relief barring Defendants from implementing the April 3 Agency Action or any similar unlawful Agency Action, by another name, to implement the Presidential Directive.

## JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), (e)(1). Defendants are United States agencies or officers sued in their official capacities. The Commonwealth of Massachusetts is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Massachusetts.

### PARTIES

13.     The State of New York is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

14.     The State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, section 15. *See* 15 Ill. Comp. Stat. 205/4.

15.     The Commonwealth of Massachusetts, represented by and through its Attorney General, Andrea Joy Campbell, is a sovereign state in the United States of America. The Attorney General is the chief law officer of the Commonwealth and is authorized under Mass. Gen. Laws ch. 12, s. 3, to pursue this action.

16.     The State of California is a sovereign state in the United States of America. California is represented by Rob Bonta, the Attorney General of California. The Attorney General acts as the chief legal representative of the state and is authorized by the California State Constitution, article V, section 13, to pursue this action.

17.    The State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of Minnesota, who is the chief law enforcement officer of Minnesota and authorized to sue on the State's behalf.

18.    The State of Colorado is a sovereign state in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

19.    Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

20.    The State of Delaware is a sovereign state in the United States of America. Delaware is represented by Attorney General Kathy Jennings, who is the chief law enforcement officer of Delaware.

21.    The State of Hawai'i is a sovereign state of the United States of America. Hawai'i is represented by Attorney General Anne Lopez who is the chief law enforcement officer of Hawai'i.

22.    The State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief law enforcement officer of Maryland.

23.    The People of the State of Michigan is represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to

bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

24.    The State of Nevada is a sovereign state of the United States of America. Nevada is represented by Attorney General Aaron Ford who is the chief law enforcement officer of Nevada.

25.    The State of New Jersey is a sovereign state in the United States of America.  New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.

26.    Plaintiff State of New Mexico is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.

27.    The State of Oregon is a sovereign state in the United States of America. Oregon is represented by Attorney General Dan Rayfield, who is the chief law enforcement officer of Oregon.

28.    The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

29.    The State of Vermont is a sovereign state of the United States of America.  Vermont is represented by Attorney General Charity Clark who is the chief law enforcement officer of Vermont.

30.    The State of Washington is a sovereign state in the United States of America. Washington is represented by Attorney General Nicholas W. Brown.  The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.

31.    The State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Attorney General Joshua Kaul who is the chief law enforcement officer of Wisconsin.

32.    Defendant the United States Department of Education ("ED") is a cabinet agency within the executive branch of the United States government.

33.    Defendant Linda McMahon ("Secretary McMahon") is Secretary of the United States Department of Education and that agency's highest ranking official.  She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity.

34.    Defendant Craig Trainor is the Acting Assistant Secretary for Civil Rights in the Department of Education.  He is sued in his official capacity.

## FACTUAL BACKGROUND

### I.    The Administration's Efforts to Weaponize Title VI of the Civil Rights Act of 1964 to Eliminate Programs that Support Diversity, Equity, and Inclusion

#### A.    ED's April 3 Agency Action

35.    On April 3, 2025, Defendant ED Office for Civil Rights sent an email to SEAs from an official government email address, OCR@ed.gov.  The email directed SEAs to comply with an unprecedented, two-fold requirement:[3] (1) sign a new certification on behalf of the SEA, and

---

[3] On April 7, ED sent a second email extending the deadline until April 24 to comply with the April 3 Agency Action.  On April 9, pursuant to an agreement reached in *Nat'l Educ. Assoc. v. U.S. Dep't of Educ.*, following a motion for temporary restraining order on the April 3 Agency Action, ED agreed not to use the Certifications by SEAs and LEAs for any purpose, including as the basis for an enforcement action, or initiate any enforcement action based on the Dear Colleague Letter, described below, until after April 24. 1:25-cv-00091 (D.N.H.), ECF No. 48-1, *available at* https://www.aclu.org/cases/national-education-association-et-al-v-us-department-of-education-et-al?document=Agreement.  On April 22, ED sent yet another email reminder to all SEAs reminding them of the April 24 deadline.

collect and return signed certifications from all LEAs, affirming they will not engage in undefined "certain" or so-called "illegal [diversity, equity, and inclusion] practices," and (2) report LEAs' signature status, any compliance issues found within the LEAs that relate to diversity, equity, and inclusion, and proposed enforcement plans for those LEAs.  And the email required SEAs to complete these tasks within 10 days.

36.    ED attached to the email a document titled, "Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and *SFFA v. Harvard*." Exhibit A.  It requires SEAs and LEAs to sign the following certification:

> On behalf of _____[SEA/LEA], I acknowledge that I have received and reviewed this Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and *SFFA v. Harvard*. I further acknowledge that compliance with the below and the assurances referred to, as well as this certification, constitute a material condition for the continued receipt of federal financial assistance, and therefore certify our compliance with the below legal obligations.

Exhibit A at 1 ("Certification").

37.    In addition to making continued federal financial assistance contingent upon the States complying with ED's certification demand, the April 3 Agency Action threatens "serious consequences" for the use of "certain" and so-called "illegal DEI practices," including: (1) using Title VI's provisions to "seek the 'termination of or refusal to grant or to continue assistance under such program,' eliminating federal funding for any SEA, LEA, or educational institution that engages in such conduct"; (2) "substantial liabilities, including the potential initiation of litigation for breach of contract by the Department of Justice . . . seeking to recover previously received funds"; and (3) "liability under the False Claims Act . . . including treble damages and civil penalties of thousands of dollars per violation."   Moreover, these "serious consequences" are

directed at "individual[s] . . . using such practices"—exceeding the reach of Title VI, which applies only to entities like school districts and not to individual personnel.

38.     The phrases "illegal DEI practices" and "certain DEI practices" that purportedly violate federal law are not defined in the April 3 Agency Action.

39.     ED's announcement of the April 3 Agency Action describes its import as a requirement for SEAs "in order to continue receiving federal financial assistance."[4]

40.     In a statement on X on April 8, Defendant Secretary of Education Linda McMahon praised Puerto Rico for signing the Certification and reiterated the impending consequences for failure to do so, stating: "Every state that wants to continue receiving federal funds should follow suit."[5]

41.     The time to comply with the April 3 Agency Action expired hours ago, at 11:59 p.m., Thursday, April 24, 2025. *But see infra* ¶ 61.

42.     In an email, dated as recently as April 22, 2025, ED confirmed the April 24 deadline and reiterated that signing the April 3 certification demand was a condition of receiving federal funding.

43.     There is every reason to expect that ED will unlawfully terminate funding to SEAs and LEAs that have not complied with the April 3 Agency Action given its recent actions elsewhere. Indeed, as a new and illegal course of enforcement—one that skips over investigation or other meaningful opportunity for review—this Administration has abruptly terminated or frozen

---

[4] Press Release, US Dep't of Educ., ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance (Apr. 3, 2025), https://www.ed.gov/about/news/press-release/ed-requires-k-12-school-districts-certify-compliance-title-vi-and-students-v-harvard-condition-of-receiving-federal-financial-assistance.

[5] Secretary Linda McMahon (@EDSecMcMahon), X.com (Apr. 8, 2025 11:30 AM), https://x.com/EDSecMcMahon/status/1909630023167819941.

funding for educational institutions and programs that it views as acting contrary to its erroneous interpretation of the law, especially in the context of its efforts to eliminate programs that support diversity, equity, and inclusion.

44.    For example, ED suddenly terminated approximately $600 million in critical grants that Congress authorized to address nationwide teacher shortages, telling the press that the grants provided training on "divisive ideologies" and "unnecessary topics such as . . . DEI."[6]

45.    The Federal Government also abruptly froze $2.2 billion in federal funding to Harvard University after it refused to comply with demands from ED and others in a proposed "agreement in principle" to "maintain Harvard's financial relationship with the federal government," including to "immediately shutter all [DEI] programs, under whatever name, and stop all DEI-based policies" . . . under whatever name[.]"[7]

46.    ED unlawfully seeks by its April 3 Agency Action to elicit swift and sweeping action by the Plaintiff States to investigate, report, and stop programs that support diversity, equity, or inclusion in order to continue receiving federal funding.  As a result, Plaintiffs' educational agencies and institutions were forced to rapidly decide whether to complete the certification and implement vague standards that do not explain what conduct ED now believes to be unlawful in order to maintain an uninterrupted stream of federal funds to which they are entitled.  In simpler terms, the federal government seeks to create a Hobson's choice of either immediately stepping

---

[6] Press Release, U.S. Dep't of Educ., U.S. Department of Education Cuts Over $600 Million in Divisive Teacher Training Grants (Feb. 17, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-cuts-over-600-million-divisive-teacher-training-grants.

[7] *President and Fellows of Harvard College v. U.S. Dep't of Health & Hum. Servs.*, 1:25-cv-11048 (D. Mass. Apr. 21, 2025), ECF No. 1-1; *see also* Letter from John Gruenbaum et al., Comm'r of the Fed. Acquisition Serv., to Alan M. Garber, President of Harvard Univ., and Penny Pritzker, Lead Member of Harvard Corp. 2–3 (Apr. 3, 2025), https://www.harvard.edu/research-funding/wp-content/uploads/sites/16/2025/04/Letter-Sent-to-Harvard-2025-04-11.pdf.

back from their legal efforts to support and provide for diversity, equity, and inclusion of all students regardless of race, color, national origin, sex, gender, and disability in schools or face the loss of essential federal funding.

47.     The April 3 Agency Action is an unjustified interference with state and local control of education, which the Supreme Court has recognized as a "deeply rooted tradition." *Bennett v. New Jersey*, 470 U.S. 632, 635 (1985); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 680–81 (2012); *Milliken v. Bradley*, 418 U.S. 717, 741–42 (1974).

48.     Plaintiffs will not step back and accede to ED's violation of the Administrative Procedure Act and the Constitution.

## B. The Underlying Presidential Directive to Eliminate Diversity, Equity, and Inclusion Programs that Purportedly Constitute Illegal Discrimination

49.     The April 3 Agency Action was not issued in a vacuum. Since January, the Trump Administration has issued a series of attacks on programs supporting diversity, equity, and inclusion, with a particular emphasis on eliminating an undefined set of activities in the nation's schools.  This effort began on January 20, 2025, when President Trump issued several executive orders targeting entities and institutions in a transparent effort to fully eliminate any diversity, equity, and inclusion activities.[8]

50.     The first of the orders, Executive Order No. 14173 ("Terminate All Diversity Equity and Inclusion Order"), requires that "[w]ithin 120 days of this order, the Attorney General and the Secretary of Education shall jointly issue guidance to all State and local educational agencies that

---

[8] Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025); Exec. Order No. 14151, Ending Radical and Wasteful DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025).

receive Federal funds, as well as all institutions of higher education that receive Federal grants or participate in the Federal student loan assistance program under Title IV of the Higher Education Act, 20 U.S.C. § 1070 *et seq.,* regarding the measures and practices required to comply with *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College,* 600 U.S. 181 (2023)."[9]  The President asserts that diversity, equity, and inclusion/diversity, equity, inclusion, and accessibility (DEI/DEIA) programs are "dangerous, demeaning, and immoral race- and sex-based preferences . . . that can violate the civil-rights laws of this Nation."[10]

51.    The second order, Executive Order 14151 ("Federal Government Diversity Equity and Inclusion Order"), directs the elimination of "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)" from all corners of the federal government.[11]

52.    Building on these earlier orders, the third pertinent order, Executive Order 14190 ("K-12 Education Diversity Equity and Inclusion Order") issued on January 29, 2025, focuses on K-12 education.[12]  This order prohibited "discriminatory equity ideology," another vague permutation of "DEI," that the order states is "an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit and capability in favor of immoral generalizations . . . ."  The order requires the Secretary of Education and other officials to put forward a plan within 90 days for preventing or rescinding federal funds

---

[9] Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025), § 5.

[10] *Id.*, § 1.

[11] Exec. Order No. 14151, Ending Radical and Wasteful DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025).

[12] Exec. Order No. 14190, Ending Radical Indoctrination in K-12 Schooling, 90 Fed. Reg. 8853 (Jan. 29, 2025).

from being used by state education agencies, local education agencies, and schools to directly or indirectly support the "instruction, advancement, or promotion" of "discriminatory equity ideology."[13]

### C. ED's Role in Implementing the Presidential Directive Prior to April 3

53.    On January 23, ED announced steps it had taken to "eliminate DEI," following the executive orders.  ED also stated it would continue its review of agency programs and services to identify any that "may be advancing a divisive DEI agenda."[14]

54.    When asked at her February 13 confirmation hearing how a school would discern whether it was running an illegal DEI program, then-nominee and now-Secretary of Education Linda McMahon did not provide a definition of DEI or any responsive answer.[15]  Secretary McMahon also testified that she did not know whether a school teaching African American history would lose federal funding.[16]

55.    The next day, on February 14, consistent with the requirement laid out in the Terminate All Diversity Equity and Inclusion Order, ED issued a Dear Colleague Letter on Title VI of the Civil Rights Act that purported to "clarify and reaffirm the nondiscrimination obligations

---

[13] *Id.*, § 3.

[14] Press Release, U.S. Dep't of Educ., U.S. Department of Education Takes Action to Eliminate DEI (Jan. 23, 2025) https://www.ed.gov/about/news/press-release/us-department-of-education-takes-action-eliminate-dei.

[15] *Hearing on the Nomination of Linda McMahon to be Education Secretary Before the Senate Committee on Health, Education, Labor and Pensions*, 119th Cong., 2025 WL 502955 (Feb. 13, 2025) (Q: "How does the school know whether it's running a DEI program or not?"  A: "Um, DEI I think has been – um, it's a program that's tough.  It was put in place ostensibly for more diversity for equity and inclusion.  And I think what we're seeing is that it's having an opposite effect").

[16] *Id.* (Q: "My son is in a public school.  He takes a class called African American History.  Um, if you're running an African American history class, could you perhaps be in violation of this court order -- of this -- of this executive order?"  A: "Uh, I'm not quite certain and I'd like to look into it further and get back to you on that.").

of schools and other entities that receive federal financial assistance from the United States Department of Education" including ED's unlawful and incorrect application of *SFFA*.[17]  In that document, however, ED acknowledged that the Dear Colleague Letter "does not have the force and effect of law and does not bind the public or create new legal standards."[18]  The Dear Colleague Letter was not cited or mentioned in the April 3 Agency Action.

56.     On February 27, ED announced the opening of its "End DEI" Portal.  ED's press release trumpets that the agency's efforts are aimed at educators it deems as "pushing critical theory, rogue sex education and divisive ideologies."[19] The portal's purpose was to provide students' access to supposedly "meaningful learning free of divisive ideologies and indoctrination," and to solicit suggestions of "illegal discriminatory practices" to investigate.[20]

57.     On February 28, ED issued a document titled, Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act ("FAQ").[21]  In the FAQ, ED again acknowledged that "the contents of this Q&A document do not have the force and effect

---

[17] Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't of Educ., to Colleagues (Feb. 14, 2025) ("DCL"), https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf.

[18] *Id.* at 1 n.3.

[19] U.S. Dep't of Educ., *U.S. Department of Education Launches "End DEI" Portal* (Feb. 27, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-end-dei-portal.

[20] Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 27, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-end-dei-portal.

[21] U.S. Dep't of Educ., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Feb. 28, 2025), https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf ("FAQ").

of law and do not bind the public or impose new legal requirements."[22]  The FAQ was not cited or mentioned in the April 3 Agency Action.

58.    In these recent materials, the Administration and ED fail to define key terms and concepts, including "divisive ideologies," "indoctrination," or "illegal discriminatory practices." And in litigation over certain of the executive orders, including the Terminate All Diversity Equity and Inclusion Order and the Federal Government Diversity Equity and Inclusion Order, courts have concluded that the plaintiffs are likely to succeed on their claims that similar language is impermissibly vague.[23]

59.    One week later, in her March 4 speech titled "Our Department's Final Mission," Secretary McMahon prominently mentioned her and President Trump's conviction that "[t]axpayer-funded education should refocus on meaningful learning in math, reading, science, and history—not divisive DEI programs and gender ideology."[24]

60.    Most recently, on April 24, a series of orders addressed ED's recent actions on diversity, equity, and inclusion.  The D.C. District Court issued a preliminary injunction to enjoin Defendants' implementation and enforcement of the certification, finding a likelihood of success on the constitutional vagueness claim.[25]  The District of New Hampshire preliminarily enjoined Defendants' enforcement or implementation of the February 14 Dear Colleague Letter, including

---

[22] *Id.* at 1 n.3.

[23] *Chicago Women in Trades v. Trump*, No. 25-cv-02005, 2025 WL 933871, at *8–9 (N.D. Ill. Mar. 27, 2025); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 125-cv-00333-ABA, 2025 WL 573764, at *1 (D. Md. Feb. 21, 2025), *opinion clarified*, No. 1:25-cv-00333-ABA, 2025 WL 750690 (D. Md. Mar. 10, 2025), *injunction stayed by* No. 25-1189 (4th Cir. Mar. 14, 2025).

[24] Linda McMahon, U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 4, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission.

[25] *NAACP v. U.S. Dep't of Educ.*, 1:25-cv-1120, ECF Nos. 30, 31 (D.D.C. Apr. 24, 2025).

through the April 3 certification requirement, to address the likely harm to schools, school districts, and educational entities that receive federal funding.[26] And the District of Maryland stayed the Dear Colleague Letter under the APA pending final resolution based on likelihood of success on the APA challenges.[27]

61.     The April 3 Agency Action constitutes a final agency action by ED implementing the Presidential Directive to all SEAs and LEAs.

## II.    The Administration's Unlawful Interpretation of Title VI's Legal Obligations

62.     Through the Presidential Directive and in ED's implementation via the April 3 Agency Action, the Administration has laid out its opposition to unspecified practices or programs it refers to vaguely as "DEI". The Administration has sought to justify its opposition by pushing unsupported and unlawful (both procedurally and substantively) interpretations of Title VI and *SFFA* that break sharply with the understandings of educators, the legal community, and all prior administrations.[28] Based on its unlawful and deliberately ambiguous interpretation, the President and ED take the harmful position that it is illegal to provide some undefined category of program, instruction, or curriculum that supports diversity, equity, and inclusion or to consider the impact of school policies and practices on diversity, equity, and inclusion.[29]

---

[26] *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 1:25-cv-00091, ECF No. 74 (D.N.H. Apr. 24, 2025).

[27] *Am. Fed'n of Tchrs. v. U.S. Dep't of Educ.*, 1:25-cv-00628, ECF Nos. 60, 61-1 (D. Md. Apr. 24, 2025).

[28] *See* FAQ, *supra* note 21, at 1.

[29] *See* "Multistate Guidance to Institutions of Higher Education and K-12 Schools," The Offices of the Attorney General for the State of Illinois, the Commonwealth of Massachusetts, and the State of New York (March 5, 2025), https://illinoisattorneygeneral.gov/News-Room/Current-News/March%205%202025%20Updated%20Joint%20Guidance%20re%20School%20Programs%20Multistate.pdf?language_id=1. By way of another example, in the context of commenting on a company's diversity, equity, and inclusion policies, President Trump posted that **"DEI WAS A HOAX THAT HAS BEEN VERY BAD FOR OUR COUNTRY. DEI IS GONE!!!".**

63.    The Presidential Directive frames "DEI programs"—which, again, is an undefined term—as "dangerous, demeaning, and immoral race- and sex-based preferences"[30] and "illegal and immoral discrimination programs."[31]  The K-12 Education Diversity Equity and Inclusion Order elaborates the Administration's view that through instruction or curriculum, "innocent children are compelled to adopt identities as either victims or oppressors solely based on their skin color and other immutable characteristics" and practices that "demand[] acquiescence to 'White privilege' or 'unconscious bias[]' actually promote[] racial discrimination and undermine[] national unity."[32]

64.    ED, like the President, has repeatedly failed to define the conduct that they seek to punish or prohibit, omitting a definition of the phrase, "diversity, equity, inclusion," or the acronyms, "DEI," or "DEI program."

65.     The April 3 Agency Action does no better, stating without further elaboration that: "The use of certain DEI practices can violate federal law," and otherwise failing to provide any specifics about which diversity, equity, and inclusion practices ED would find objectionable.

66.    ED makes these statements notwithstanding that countless programs that support diversity, equity, or inclusion in schools are legal and, in fact, required by federal civil rights and funding statutes.

---

President Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 26, 2025, 5:01 AM), https://truthsocial.com/@realDonaldTrump/posts/114070315739588346 (emphasis in original).

[30] Exec. Order 14173, §1.

[31] Exec. Order 14151, § 1.

[32] Exec. Order 14190, § 1; *see also* Julia Conley, '*He's Not Kidding,' Advocates Warn as Trump Threatens to Defund Schools for Teaching US History*, MSN.com (Oct.19, 2024), https://www.msn.com/en-us/news/politics/he-s-not-kidding-advocates-warn-as-trump-threatens-to-defund-schools-for-teaching-us-history/ar-AA1syrmK#image=1 (noting that President Trump stated that schools would "lose funding" if they taught that America is "built off the backs of slaves, on stolen land.").

67. For example, the Every Student Succeeds Act ("ESSA") from which Plaintiff States receive the largest source of federal funding requires, as a condition for receiving such funds, that SEAs implement a number of practices relating to "diversity," "equity", or "inclusion." *See, e.g.*, 20 U.S.C. § 6311(b) (requiring inclusion of English Language Learners); *id.* § 6311(c) (requiring meaningful differentiation for students, including subgroups).[33]

68. Similarly, the Individuals with Disabilities Education Act of 1975 ("IDEA"), from which Plaintiff States receive the second largest source of federal funding, requires, as a condition for receiving federal funds, the provision of specially designed instruction and an individualized education program, provided at no cost to parents, that meets the needs of a child with a disability. *See* 20 U.S.C. § 1412(a).

69. Other federal civil rights statutes, including Section 504 of the Rehabilitation Act of 1974 ("Section 504") and the Americans with Disabilities Act ("ADA"), were established to end exclusion of students (and others) with disabilities in our institutions, and to ensure inclusion and equity.

70. Title VI itself explicitly prohibits schools from "exclud[ing] from participation" any student on the basis of race, color, or national origin, thereby requiring inclusion. 42 U.S.C.§ 2000d.

71. Similarly, Title IX of the Education Amendments Act of 1972 explicitly prohibits schools from "exclud[ing] from participation" any student on the basis of sex, thereby requiring inclusion. 20 U.S.C. § 1681.

---

[33] U.S. Dep't of Educ., *Every Student Succeeds Act (ESSA)*, https://www.ed.gov/laws-and-policy/laws-preschool-grade-12-education/every-student-succeeds-act-essa (last reviewed Apr. 24, 2025) (ESSA "[a]dvances equity by upholding critical protections for America's disadvantaged and high-need students").

72.     Accordingly, the principles of equity, diversity, and inclusion in schools are built into the very fabric of the federal funding formula and civil rights statutes from which states receive the vast majority of funding.

73.     Such programs or curricula also confer important educational and social benefits to students. These benefits include providing all students with an equal opportunity to learn, accommodating and including students with disabilities, better preparing students as workers and citizens in a diverse country with the ability to understand each other and work together even with their differences, and strengthening our educational institutions by creating welcoming and inclusive environments that value all perspectives from all individuals, regardless of race, color, national origin, disability, sex, gender, or religion.  Indeed, contrary to ED's implementation of the Presidential Directive, Plaintiff States cannot ignore that diversity, equity, and inclusion are beneficial because they *expand* access to educational opportunities and provide enriching programming for all students.[34]

74.     Nevertheless, the April 3 Action, and ED's actions leading up to that date, have already begun to cause educators to restrict or second-guess their efforts to provide diverse learning opportunities for students—opportunities that statutes like ESSA and IDEA were intended to foster.  For example, a court recently called attention to a high school English teacher who is grappling with whether he can continue to teach Joseph Conrad's *Heart of Darkness* because it involves issues of "racism and European imperialism."[35]  The court also took note of a special

[34] Susan Groundwater, et al., *2023 State of Diversity, Equity, Inclusion, and Belonging*, Hanover Rsch. 9 (Oct. 2023) (citing many studies); *see also* David Altstadt, *Ahead of the Curve State Success in Developmental Education Initiative*, Jobs for the Future (Dec. 2012); Amy Stuart Wells, et al., *How Racially Diverse Schools and Classrooms Can Benefit All Students*, The Century Foundation (Feb. 9, 2016), https://tcf.org/content/report/how-racially-diverse-schools-and-classrooms-can-benefit-all-students/.

[35] *See Nat'l Educ. Assoc.*, 1:25-cv-00091, ECF No. 74 at 51 (D.N.H Apr. 24, 2025).

education professor, who is removing terms like "disability" and "inclusion" from course materials, even as "national standards require that professors who are preparing students for special education roles teach with this kind of focus."[36]  It is not difficult to see why educators would be fearful of continuing with long-established curricula, given the tone of communications from ED, which aim their crosshairs on teachers ED considers to be "pushing critical theory, rogue sex education and divisive ideologies"[37] or "indoctrinat[ing] students with the false premise that the United States is built upon 'systemic and structural racism'"[38]—a charge that would surprise most scholars of the Civil War.

75.    Without acknowledgement or justification, the April 3 Agency Action reverses and conflicts with decades of law, policy, and guidance.

76.    This includes mandates from several presidential administrations, including Donald Trump in his first term, that supported and developed the diversity, equity, and inclusion initiatives that now exist. For instance, former Secretary of Education Betsy DeVos informed ED staff in 2020 that "[d]iversity and inclusion are the cornerstones of high organizational performance" and "embracing diversity and inclusion are key elements for success" for "building strong teams."[39] And in 2023, in response to the *SFFA* decision on which it now claims to rely, ED issued guidance

---

[36] *See id.* at 34.

[37] U.S. Dep't of Educ., *U.S. Department of Education Launches "End DEI" Portal* (Feb. 27, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-end-dei-portal.

[38] DCL, *supra* note 17, at 2.

[39] Erica L. Green & Zach Montague, *Trump Cracks Down on Diversity Initiatives Celebrated in His First Term*, N.Y. Times (Feb. 14, 2025), https://www.nytimes.com/2025/02/14/us/politics/trump-diversity-education-department.html.

that schools could "continue to articulate missions and goals tied to student body diversity and may use all legally permissible methods to achieve that diversity."[40]

77.    With its recent interpretations and actions, ED is not only abruptly changing course and creating significant conflicts with various federal laws. It is also requiring funding recipients, including Plaintiffs, to immediately execute a new, novel, and unlawful certification that, among other things, appears designed to encourage adoption of ED's confusing and ever-shifting position on "DEI"—and to require its full implementation within days and without question—or face immediate punishment, such as withdrawal of funding, False Claims Act cases, and other punitive actions.[41]

78.    More broadly, ED's own enabling legislation, the Department of Education Organization Act, curtails the Department's authority "to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system."  20 U.S.C. § 3403(b); *accord Mauricio v. Daugaard*, 895 N.W.2d 358, 364 (S.D. 2017) ("Congress has made it clear that [ED] has no authority to nationalize curricula.").

### III.    Plaintiff States Are Harmed by ED's Unlawful and Defective Efforts to Require Unlawful Certification and Other Conditions to Continue Receiving Federal Funding by the April 3 Agency Action.

79.    ED's implementation of the Presidential Directive through the April 3 Agency Action is engineered to guarantee Plaintiff States' failure to meet ED's new funding and collection conditions and subsequent termination of their federal education funding.

---

[40] *See* U.S. Dep't of Educ., *Questions and Answers Regarding the Supreme Court's Decision in* Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina (Aug. 14, 2023).  This document is no longer available at ED's web site but may be found at *Nat'l Educ. Assoc.*, 1:25-cv-00091, ECF No. 34-6.

[41] DCL, *supra* note 17, at 4; FAQ, *supra* note 21, at 9–10; Exhibit A at 3.

80.    For those entities that sign the certification in the form requested by ED, ED will take the position that its current interpretation of Title VI's legal obligations will become a "material condition for the continued receipt of federal financial assistance," despite ED's undefined prohibitions of "certain" and "illegal" DEI practices, and its erroneous interpretation of *SFFA v. Harvard*. Exhibit A at 3.

81.    For entities who do not certify in the form requested by ED, ED will deem the lack of response as a failure to submit necessary certifications for continued federal funding.[42]

82.    Collectively, Plaintiff States receive more than $7.9 billion in formula federal Title I funding, with each Plaintiff State having a significant amount in immediate peril.  For instance, for fiscal year 2024, Michigan was awarded approximately $566 million in formula federal Title I funding; New Jersey was awarded approximately $460 million in formula federal Title I funding; Minnesota was awarded approximately $188 million in formula federal Title I funding; and Oregon was awarded approximately $191 million in formula federal Title I funding.

83.    The ESSA, which establishes the federal funding formula for Title I grants to States, contains a broad rule against any officer or employee of the federal government using Title I to "mandate, direct, or control a State, local educational agency, or school's specific instructional content, academic achievement standards and assessments, curriculum, or program of instruction." 20 U.S.C. § 6575; *see also id.* §§ 6571(d) ("Regulations to carry out this subchapter [Title I] may not require local programs to follow a particular instructional model, such as the provision of

---

[42] Press Release, US Dep't of Educ., ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance (Apr. 3, 2025), https://www.ed.gov/about/news/press-release/ed-requires-k-12-school-districts-certify-compliance-title-vi-and-students-v-harvard-condition-of-receiving-federal-financial-assistance; Secretary Linda McMahon (@EDSecMcMahon), X.com (Apr. 8, 2025 11:30 AM), https://x.com/EDSecMcMahon/status/1909630023167819941.

services outside the regular classroom or school program."); 7906a(a) ("No officer or employee of the Federal Government shall, through grants, contracts, or other cooperative agreements, mandate, direct, or control a State, local educational agency, or school's specific instructional content, academic standards and assessments, curricula, or program of instruction developed and implemented to meet the requirements of this chapter [ESEA] . . ., nor shall anything in this chapter [ESEA] be construed to authorize such officer or employee to do so."), 7907(a) (same).

84.    Plaintiff States also receive more than $5.9 billion in formula federal funding pursuant to the Individuals with Disabilities in Education Act, *id.* §§ 1400–1409, again demonstrating that each Plaintiff State has a significant amount of such funding at issue.  For instance, for fiscal year 2024, Michigan was awarded approximately $488 million in formula federal IDEA funding; New Jersey was awarded approximately $445 million in formula federal IDEA funding; Minnesota was awarded approximately $221 million in formula federal IDEA funding; and Oregon was awarded approximately $170 million in formula federal IDEA funding.

85.    The IDEA requires States, among other things, to take actions to ensure inclusion and accommodation of students with disabilities. As ED's own website recognizes, "implementation of inclusive education practices" helps ensure that "children with disabilities have access to learning environments that meet their individual needs" and "is critical" to "promoting student achievement and preparation for global competitiveness."[43]  And IDEA was signed into law for the purpose of ensuring inclusion "in response to systemic exclusion of students

---

[43] U.S. Dep't of Educ., Building and Sustaining Inclusive Educational Practices (Jan. 17, 2025), https://sites.ed.gov/idea/idea-files/building-and-sustaining-inclusive-educational-practices-january-2025/ (last modified Jan. 17, 2025).

with disabilities from public schools, which only educated one in five students with disabilities at that time."[44]

86.    ED's Implementation of the Presidential Directive puts Plaintiff States' more than $18.7 billion of federal funding for education at prospective and retrospective risk.  By way of example, for fiscal year 2024, Michigan Department of Education has yet to drawdown approximately $344 million in IDEA; for fiscal year 2024, Michigan Department of Education has yet to drawdown approximately $566 million in Title I funds.  For all currently outstanding ED grants to Michigan Department of Education, including grants from previous fiscal years that remain open, Michigan Department of Education has yet to drawdown approximately $1.3 billion.

87.    The impending loss of federal funding harms Plaintiff States' provision of public education to students from kindergarten through high school.

88.    For example, Massachusetts receives more than $500 million in federal funding through Title I and the Individuals with Disabilities Education Act.  The Commonwealth would not be able to fully replace these federal funds. Among other things, the federal funding that Massachusetts receives supports low-income students and students with disabilities, and helps improve teacher effectiveness and the quality of education for all students.  Losing this funding would undermine students' access to high-quality learning environments and experiences.

89.    In Illinois, around 1.8 million students across 862 school districts benefit from more than $1.5 billion in federal grants awarded by ED in this fiscal year alone.  Losing access to these funds would devastate Illinois communities.  Among many other purposes, Illinois educators use these federal grants to provide academic services and programming for at-risk students, to support

---

[44] *Id.*

rural school districts serving concentrations of children from low-income families, and to ensure that homeless children have equal access to public education.

90.     The over $3 billion dollars in federal grants awarded to New York support more than 2.4 million students in the state.  This funding is crucial to ensure that children from low-income households and living in high-poverty communities have the resources needed to overcome barriers to learning and success, and that students with disabilities have access to a free appropriate public education.  A loss of federal funding would be catastrophic for New York, including for two of the state's largest school districts, Rochester and Buffalo, who receive over 17% of their revenue from federal funds, as well as Syracuse and Binghamton city school districts which receive over 14%.

91.     If Minnesota were to lose the funding for the programs described above, resources that have been appropriated by Congress and obligated to Minnesota, Minnesota would be unable to replace federal funding administered by ED.  The results would be catastrophic for Minnesota students. Specifically, the academic impact from loss of instructional support and the economic impact from loss of jobs in Minnesota schools will result in lasting damage to the State's efforts to ensure equal access to education for all students.  Loss of special education funding would devastate schools and districts' abilities to serve students with disabilities.  Federal special education funding is essential to ensure adequate teachers, paraprofessionals, and other supports needed to provide students with a free appropriate education in the least restrictive environment. Federal education funding has long been a stable, predictable support for our schools and the most at-risk and high-need children they serve.  The instability caused by retroactive changes to requirements and threats to funding cause irreparable harm to these critical services for students.

92.     The April 3 Agency Action harms Plaintiff States by setting up the loss of their funding if they do not sign the certification, as well as meet onerous reporting, investigatory, and planning conditions, and threatening enforcement of its unlawful (procedurally and substantively) terms even if they do.

93.     In that Action, ED states the "serious consequences" that place Plaintiff States' federal education funding in jeopardy, regardless of whether SEAs or LEAs sign the Certification. Exhibit A at 3.  These include not only termination of prospective federal funding for Plaintiffs' education agencies, but also clawing back previously received funds and liability for treble damages under the False Claims Act.

94.     Plaintiff States have repeatedly certified that they are in compliance with Title VI and all other federal anti-discrimination laws, including repeating that commitment in response to the April 3 Agency Action and providing information about certifications already in ED's possession.  However, no Plaintiff State has assented to the April 3 Agency Action's additional certification of compliance aligned with the ambiguous and unlawful prohibition on undefined "certain" or so-called "illegal" "DEI" set by the April 3 Agency Action implementing the Presidential Directive.  Rather, Plaintiff States cannot comply with that demand of the April 3 Agency Action because the vague standards set forth in the certification document operate coercively to curb conduct required by federal and state laws that call on educational institutions to incorporate certain support and provide for diversity, equity, and inclusion.

95.     ED's implementation of the Presidential Directive is ambiguous and leaves Plaintiffs' educational agencies without a clear sense of what practices ED believes constitute "illegal DEI" or could be penalized by ED.  Thus, even if the April 3 Agency Action provided Plaintiff States with a meaningful opportunity to comply in order to keep their funding, which it

does not, this ambiguity pressures Plaintiff States to curtail lawful, congressionally sanctioned and required, initiatives and programs that support diversity, equity, and inclusion, in order to dispel all fear of losing federal funds or becoming a target of enforcement.

### A. The States' Responses to ED's Implementation of the Presidential Directive

96.    SEAs routinely certify compliance with federal nondiscrimination laws as a condition of federal funding, as the April 3 Agency Action recognizes.

97.    And SEAs had already certified compliance with Title VI and its implementing regulations prior to receiving the April 3 Agency Action, including during this Fiscal Year, and ED had received the prior certifications, which remained in effect.

98.    Among other federal formula grants, Plaintiff States receive formula grant federal funding for public schools with the highest percentages of children from low-income families under Title I, Part A of the Elementary and Secondary Education Act of 1965 ("ESEA"), as amended by the ESSA, and must "have on file . . . a single set of assurances" that "each such program will be administered in accordance with all applicable statutes, regulations, program plans, and applications."  20 U.S.C. § 7844(a).

99.    Plaintiff States also receive formula grant federal funding for schools to provide special education and related services to children with disabilities under Parts A and B of the IDEA.

100.    Prior assurances that SEAs were required to submit were approved by the Office of Management and Budget ("OMB")[45] in accordance with the federal Paperwork Reduction Act, which requires ED to provide an opportunity for notice and comment related to "collections of

---

[45] *See* OMB.report, *Assurance of Compliance-Civil Rights Certificate*, https://omb.report/icr/202404-1870-001/doc/141488800 (last accessed Apr. 23, 2025) ("Assurance of Compliance"); *see also* U.S. Department of Education, Revised Assurances Template, Issued May 2017, https://www.ed.gov/sites/ed/files/2020/10/reviseded18100576.pdf (last accessed Apr. 25, 2025).

information" of this nature, and seek approval from the OMB Director, among other steps, prior to seeking submission of information by third parties, including state and local governments. 44 U.S.C. §§ 3501, *et seq*.

101.    SEAs had already submitted the Title VI certification approved by OMB or ED during this fiscal year and in prior years.

102.    In the OMB-approved and Paperwork Reduction Act compliant certification still on the OMB's website, OCR stated that Plaintiff States only need to sign assurances once and OCR will keep the signed assurances on file. [46]

103.    Unlike with prior requests for assurances, the April 3 Agency Action required SEAs to obtain separate certifications for each of the LEAs in their state, regardless of whether the State is a local control state or the number of LEAs in the state, which for some states is in the hundreds or thousands. For example, Massachusetts has nearly 400 LEAs, including more than 300 school districts, 24 educational collaboratives, and 70 charter schools. California has nearly 2,000 LEAs, and New York has nearly 1,000 LEAs.

104.    It also mandates that SEAs investigate, report, and propose enforcement plans for LEAs that were not in compliance with the requirements laid out in the April 3 Agency Action. SEAs were thus required to engage in unprecedented coordination with and investigation of thousands of LEAs regarding adoption and compliance with new requirements on an extremely short timeframe.

_____

[46] *See* Assurance of Compliance, *supra* note 45; OMB.report, *Supporting Statement for Paperwork Reduction Act Submission*, https://omb.report/icr/202404-1870-001/doc/141488800 (last revised June 11, 2024).

105.    The April 3 Agency Action was not approved by OMB in accordance with the requirements of the Paperwork Reduction Act.

106.    On April 9, Massachusetts responded to the April 3 Agency Action with a letter acknowledging that the state does and will comply with federal nondiscrimination statutes, regulations, and case law.  Massachusetts' response emphasized its regular certifications of compliance for federal programs, the state's high-quality education that is strengthened by people of diverse backgrounds, and ED's lack of authority to demand additional certifications in this manner.  To date, Massachusetts has not received a response from ED.

107.    On April 9, Illinois responded to the April 3 Agency Action with a letter stating that it has certified that it complies with federal nondiscrimination statutes, regulations, and caselaw, and submits regular certifications of compliance for federal programs.  The letter expressed concern that ED seemingly sought to change the terms and conditions of the state's award without formal administrative process and was not clear about the specific programs or activities it sought to regulate. To date, Illinois has not received a response from ED.

108.    On April 4, New York responded to the April 3 Agency Action with a letter stating that New York has certified, on multiple occasions, that it does and will comply with Title VI and its implementing regulations, and that its most recent certification remains in effect.  The letter also noted ED's lack of authority to impose additional certification requirements on SEAs as part of the administration's targeting of undefined diversity, equity, and inclusion practices.  To date, New York has not received a response from ED.

109.    On April 24, 2025, the Maryland State Department of Education responded to the April 3 Agency Action with a letter declining to provide a certification in the form requested by ED, but "certif[ying] that the Maryland State Department of Education will continue to comply

with Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, and its prohibition against discrimination on the basis of race, color, and national origin, as well as related federal regulations and court decisions."  Maryland also collected similar certifications from each of Maryland's local education agencies and forwarded them to ED with its response. To date, Maryland has not received a response from ED.

110.    On April 10, 2025, the Michigan Department of Education responded to the April 3 Agency Action by letter, explaining that it had previously certified compliance with Title VI, it remained in compliance with Title VI, and the lack of clarity regarding the undefined prohibitions of "certain" and "illegal" DEI practices was concerning especially when tied to necessary and relied upon funding.  To date, Michigan has not received a response from ED.

111.    On April 14, 2025, Vermont responded to the April 3 Agency Action certifying compliance with current Title VI statutory, regulatory, and decisional law, while objecting to the April 3 Agency Action, including based on its undefined concepts of "certain DEI practices" and "illegal DEI".  In this letter, Vermont explained that DEI practices in Vermont are supportive of all students, and aim to create and sustain positive, welcoming learning environments, and that these practices will continue.

## CAUSES OF ACTION

### COUNT I
### Violation of APA § 706(2)(D) - Without Observance of Procedure Required by Law
{As against All Defendants}

112.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

113.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be…without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

114.    When issuing legislative rules, federal agencies are required to follow the notice-and-comment process set forth in the APA.  *E.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95–96 (2015) (explaining rulemaking requirements of 5 U.S.C. § 553(b)).

115.    The agency must publish a "[g]eneral notice of proposed rule making" in the Federal Register.  5 U.S.C. § 553(b).  That notice must describe "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(3).  The agency must further provide "interested persons" an "opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c).

116.    While ED recognized that its interpretation of "illegal DEI" and *SFFA,* as set forth in its Dear Colleague Letter and FAQ, had "no force or effect of law" it nevertheless issued the April 3 Agency Action requiring Plaintiff States to certify under penalty of federal funding withdrawal and other punishments.

117.    ED has thereby attempted to impose a new basis for Title VI enforcement and withholding, which is a legislative rule, not an interpretive rule or a general statement of policy. *See, e.g.*, *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70–74 (1st Cir. 2018) ("We have said that a legislative rule is one that 'creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself.'"); *accord Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) (characterizing legislative rules as those that "impose legally binding obligations or prohibitions on regulated parties); *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (explaining that a legislative rule "supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy"); *Syncor Int'l v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997) (noting that "a substantive rule

*modifies* or *adds* to a legal norm"); *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993) (explaining that a rule is legislative, inter alia, if there is no "adequate legislative basis for enforcement action" without the rule, or if the rule "effectively amends a prior legislative rule"); *see also Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 357–58 (D.C. Cir. 2017) (treating legislative rules as binding upon the agency, whereas interpretive rules and policy statements leave the agency "free to exercise discretion").

118.    There are no circumstances that would create good cause for ED to forgo notice and comment in issuing the April 3 Agency Action.  *See* 5 U.S.C. § 553(b)(B).

119.    ED does not invoke the good cause exception in the April 3 Agency Action by "incorporat[ing] the finding [of good cause] and a brief statement of reasons therefor" as required by § 553(b)(B).

120.    In using the April 3 Agency Action to issue a legislative rule, Defendants have failed to follow the procedural requirements of the APA.  The April 3 Agency Action is therefore unlawful and must be set aside.  Plaintiffs are further entitled to a preliminary and permanent injunction preventing any implementation by Defendants of the April 3 Agency Action and any similar unlawful Agency Action, by any other name, to implement the Presidential Directive.

## COUNT II
### Violation of APA § 706(2)(A) – Arbitrary and Capricious
{As against All Defendants}

121.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

122.    The APA provides that courts must "hold unlawful and set aside" final agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

123.    Defendant ED is an "agency" under the APA, 5 U.S.C. § 551(1), and ED's April 3 Agency Action is final agency action subject to review under the APA.

124.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  This requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  This "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

125.    Agencies may not rely on explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*  A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

126.    An action is arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it.  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

127.    In addition, when an agency "rescinds a prior policy," the agency must, at minimum, "consider the 'alternatives' that are within the ambit of the existing policy," "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 30, 33.

128.    ED has provided no reasoned basis or explanation for imposing these new terms and conditions on SEAs and LEAs via the April 3 Agency Action.  Instead, the basis for these actions is a gross misreading of the governing law on race discrimination in education.

129.    The April 3 Agency Action itself is also not reasonable or reasonably explained. In fact, the Action fails to define critical terms, such as "DEI", "certain DEI practices" or "illegal DEI."

130.    Additionally, ED's April 3 Agency Action flies in the face of decades of history (including in the years following *SFFA*) where ED took the position that diversity, equity, and inclusion programs generally, including by Plaintiffs in K-12 Education, are not only *legal* under federal law but *commendable*.  ED provides no explanation for its deviation from this longstanding agency view.

131.    Further, ED has ignored States' strong reliance interest in implementing an array of state laws and programs targeted at increasing diversity, equity, and inclusion in education that are legal under existing law, including *SFFA*.

132.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendant's April 3 Agency Action violates the APA because it is arbitrary and capricious.

133.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing any implementation by Defendants of the April 3 Agency Action or any similar unlawful Agency Action, by any other name, to implement the Presidential Directive.

### COUNT III
### Violation of APA § 706(2)(A) – Contrary to Law
{As against All Defendants}

134.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

135.    Defendant ED is an "agency" under the APA, 5 U.S.C. § 551(1), and ED's April 3 Agency Action is final agency action subject to review under the APA.

136.    The APA requires courts to "hold unlawful and set aside" agency actions that are "not in accordance with law."  *Id.* § 706(2)(A).

137.    ED's April 3 Agency Action is contrary to numerous laws, including:

i.    Title VI, which *prohibits* discrimination in education, including exclusion of students on the basis of race, color, or national origin. Title VI does not support coercing States and their instrumentalities to take regressive steps that undo lawful efforts to remedy discrimination. Moreover, Title VI only applies to school districts, "program[s and] activit[ies]" and cannot support agency action aimed at "individual[s]," as the April 3 Action purports to do.

ii.    ED's own enabling legislation, the Department of Education Organization Act, which limits ED's authority by mandating it "protect the rights of State and local governments and public and private educational institutions in the areas of educational policies," 20 U.S.C. § 3403(a), and providing that ED lacks authority "to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system." *Id*. § 3403(b); *accord Mauricio v. Daugaard*, 895 N.W.2d 358, 364 (S.D. 2017) ("Congress has made it clear that [ED] has no authority to nationalize curricula.").

iii.    Other statutes that prohibit certain Government interference with State education efforts, including 20 U.S.C. § 6692 (prohibiting the Federal Government from mandating, directing, or controlling instructional content, curricula, or programs of SEAs and LEAs); *id.* § 7906a (prohibiting Federal mandates, direction, or control of elementary and secondary schools); *id.* § 7907(b)-(c) (prohibiting Federal interference in SEA and LEA curricular and instructional content decisions); *id.* § 1232a (prohibiting Federal control of education); *id.* § 3403 (cabining the ED's relationship with States).

iv.    The Paperwork Reduction Act and its implementing regulations, which require agencies such as ED to review proposed "collections of information," such as April 3 Agency Action, provide an opportunity for notice and comment, and seek approval from the OMB Director, among other steps, prior to seeking submission of information by third parties, including state and local governments. 44 U.S.C. §§ 3501 *et seq*.; 5 C.F.R. pt. 1320.   The Act further prescribes requirements agencies must observe when executing such requests and prohibits imposing penalties for failure to respond to a noncompliant information request. 44 U.S.C. § 3512(a).

v.    The IDEA, ADA, and Section 504, which require inclusion and accommodation of students with disabilities.

138.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that ED's April 3 Agency Action violates the APA because it is contrary to law.

139.     Plaintiffs are further entitled to a preliminary and permanent injunction preventing any implementation by Defendants of the April 3 Agency Action or any similar unlawful Agency Action, by any other name, to implement the Presidential Directive.

### COUNT IV
### Violation of the APA § 706(2)(C) – In Excess of Statutory Authority
{As against all Defendants}

140.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

141.     Defendant ED is an "agency" under the APA, 5 U.S.C. § 551(1), and ED's April 3 Agency Action is final agency action subject to review under the APA.

142.     Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be…in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C).

143.     Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)).  In *Loper Bright*, the Supreme Court clarified that historical principles of "respect" did not equate to deference, and that "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference."  *Id.* at 392. Rather, it "remains the responsibility of the court to decide whether the law means what the agency says."  *Id.* (quoting *Mortg. Bankers Ass'n*, 575 U.S. at 109 (Scalia, J., concurring in judgment)).

144.     ED's April 3 Agency Action grossly misinterprets Title VI in order to threaten Plaintiffs' SEAs and local LEAs and coerce them into curtailing or abandoning legal programs. Title VI does not grant this authority.

145.    ED's April 3 Agency Action also contradicts federal laws prohibiting federal officials from interfering with state and local curricula.  *See, e.g.*, 20 U.S.C. §§ 6692, 7906a, 7907(b)–(c), 1232a, 3403.

146.    As a result, ED has exceeded its statutory authority.

147.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that ED's April 3 Agency Action violates the APA because it has exceeded its statutory authority.

148.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing any implementation by Defendants of the April 3 Agency Action or any similar unlawful Agency Action, by any other name, to implement the Presidential Directive.

**COUNT V**
**Violation of the APA § 706(2)(C) – In Excess of Statutory and Regulatory Authority**
{As against all Defendants}

149.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

150.    Defendant ED is an "agency" under the APA, 5 U.S.C. § 551(1), and ED's April 3 Agency Action is final agency action subject to review under the APA.

151.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C).

152.    Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright*, 603 U.S. at 391 (quoting *United States v. Morton Salt*, 338 U.S. 632, 644 (1950)). In *Loper Bright*, the Supreme Court clarified that historical principles of "respect" did not equate to deference, and that "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are not entitled to deference." *Id.* at 392 (emphasis in

original). Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

153.    Congress provided that SEAs, like those of the Plaintiff States, that submit consolidated applications for federal funding under Chapter 70 of Title 20 of the United States Code "shall have on file with the Secretary a single set of assurances, applicable to each program for which the plan or application is submitted, that provides that . . . each such program will be administered in accordance with all applicable statutes, regulations, program plans, and applications." 20 U.S.C. § 7844(a)(1).

154.    The April 3 Agency Action is not authorized by 20 U.S.C. § 7844(a)(1) because all of the Plaintiff States' SEAs have already provided the required "single set of assurances" to ED in connection with their consolidated applications for federal funding.

155.    In addition, Congress authorized ED to promulgate regulations to enforce Title VI's prohibition against discrimination under federally assisted programs on ground of race, color, or national origin. 42 U.S.C. § 2000d-1.

156.    ED has promulgated regulations pursuant to this congressional authority.  34 C.F.R. §§ 100, *et seq.*

157.    Among other things, those regulations reiterate Title VI's statutory prohibition on discrimination based on race, color, or national origin and provide examples of specific discriminatory action forbidden under Title VI. *Id.* § 100.3(a), (b).

158.    Under those regulations, "[e]very ***application*** by a State or a State agency for continuing Federal financial assistance to which this regulation applies (including the Federal financial assistance listed in part 2 of appendix A) shall as a condition to its approval and the

extension of any Federal financial assistance pursuant to the application (1) contain or be accompanied by a statement that the program is (or, in the case of a new program, will be) conducted in compliance with all requirements imposed by or pursuant to this regulation, and (2) provide or be accompanied by provision for such methods of administration for the program as are found by the responsible Department official to give reasonable assurance that the applicant and all recipients of Federal financial assistance under such program will comply with all requirements imposed by or pursuant to this regulation." *Id.* § 100.4(b) (emphasis added).

159.    In addition, "[e]very ***application*** for Federal financial assistance" not covered by the regulation cited above "shall, as a condition to its approval and the extension of any Federal financial assistance pursuant to the application, contain or be accompanied by an assurance that the program will be conducted or the facility operated in compliance with all requirements imposed by or pursuant to this part." *Id.* § 100.4(a) (emphasis added).

160.    The April 3 Agency Action is not authorized by 34 C.F.R. § 100.4(a) or (b) because it does not ask SEAs and LEAs to certify their compliance with Title VI pursuant to an application for federal financial assistance.  In addition, the April 3 Agency Action is not authorized by 34 C.F.R. § 100.4(a) or (b) because it does not ask SEAs and LEAs to certify their compliance with a requirement imposed by or pursuant to Part 100 of Title 34 of the Code of Federal Regulations, or any other federal law.

161.    ED is not authorized by any statute or regulation to require assurances of compliance with Title VI from the Plaintiff States' SEAs and LEAs at any point in time other than in connection with an application submitted under 20 U.S.C. § 7844(a)(1) or 34 C.F.R. § 100.4(a) or (b).

41

162.    In addition, ED is not authorized by any statute or regulation to impose upon SEAs or LEAs the executive branch's erroneous views of Title VI's scope and application (as opposed to the plain language of the statute enacted by the legislative branch or the authoritative interpretation of the statute established by the judicial branch).

163.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that ED's April 3 Agency Action violates the APA because it has exceeded its statutory and regulatory authority.

164.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing any implementation by Defendants of the April 3 Agency Action or any similar unlawful Agency Action, by any other name, to implement the Presidential Directive.

**COUNT VI**
**Violation of the Separation of Powers – Usurping Legislative Authority**
{As against all Defendants}

165.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

166.    The separation of powers is a "foundational doctrine[] evident from the Constitution's vesting of certain powers in certain bodies." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 227 (2020).  The judiciary's constraint of overreach by another branch of government "is integral to fulfilling the vision of the 'Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty.'"  *Hernandez-Lara v. Lyons*, 10 F.4th 19, 43 (1st Cir. 2021) (quoting *Mistretta v. United States*, 488 U.S. 361, 380 (1989)).

167.    Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in . . . Congress."  U.S. Const. art. 1, § 1.  Article II of the Constitution entrusts to the President the duty to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3; *see Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 327 (2014) ("Under our system of government,

42

Congress makes laws and the President, acting at times through agencies . . ., faithfully execute[s] them." (internal quotation marks and citations omitted)).

168.    Consistent with these principles, executive branch powers are limited to those specifically conferred by the Constitution and federal statutes, and do not include any undefined residual or inherent power.

169.    The United States Constitution does not authorize the Executive Branch to enact, amend, or repeal statutes. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

170.    Indeed, Executive Branch officials act at the lowest ebb of their constitutional authority and power when they act contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

171.    Congress has established a statutory framework for the distribution of billions of dollars in annual formula funding to public primary and secondary schools. *See, e.g.*, Title I of the Elementary and Secondary Education Act, 20 U.S.C. §§ 6303-6577, and the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1409.

172.    It has also enacted Title VI, Title IX, and numerous other statutes that prohibit discrimination, including in education, which constitute an additional check on the Executive's authority when administering federal funding for education.

173.    Title VI prohibits federal assistance to any program that discriminates "on the ground of race, color, or national origin." 42 U.S.C. § 2000d. Neither the text of Title VI, nor any other statute or other condition enacted by Congress, prohibits recipients of federal funding from according concern to issues of diversity, equity, or inclusion. The Supreme Court has never interpreted Title VI in *SFFA* or otherwise to prohibit diversity, equity, and inclusion programs.

174.    By threatening to withhold billions of dollars in Title I and IDEA funding from Plaintiffs, Defendants have effectively re-written the law to target Plaintiffs—this the Executive cannot do without violating the Separation of Powers. *See Biden v. Nebraska*, 600 U.S. 477, 503 (2023).

175.    In the same breath, Defendants contravene multiple other congressional directives not to dictate the subject of educational programming, instruction, or curriculum and to provide for inclusive environments that accommodate the needs of all students, including English Language Learners and students with disabilities.

176.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that ED violates the constitutional principles of the separation of powers doctrine, and impermissibly arrogates to the executive power that is reserved to Congress, through the April 3 Agency Action.

177.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing any implementation by Defendants of the April 3 Agency Action or any similar unlawful Agency Action, by any other name, to implement the Presidential Directive.

## COUNT VII
### Appropriations Clause
{As against all Defendants}

178.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

179.    The Appropriations Clause of the Constitution provides in part that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. Art. I, § 9, cl. 7.  The clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."  *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

180.    The Appropriations Clause likewise requires that the executive spend appropriated funds for their designated purpose.  *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals."); *In re Aiken Cnty.*, 725 F.3d 255, 261 (D.C. Cir. 2013) ("[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program.  But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds.") (Kavanaugh, J.).

181.    Defendants unilaterally assert the power to revoke spending of funds allocated by Congress for educational assistance on the agency's determination that a program recipient engages in "certain DEI practices" that are not to ED's liking.

182.    In appropriating funding for financial support to public schools, Congress neither imposed conditions related to "DEI practices" nor delegated such authority to the Executive.

183.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that ED unconstitutionally usurps the appropriations power through the April 3 Agency Action.

184.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing any implementation by Defendants of the April 3 Agency Action, or any unlawful Agency Action, by any other name, to implement the Presidential Directive.

### COUNT VIII
### Spending Clause
{As against all Defendants}

185.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

186.    The Spending Clause provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common defense and

general Welfare of the United States[.]" U.S. Const. art. I § 8, cl. 1. This clause vests the spending power in Congress alone, authorizing it to raise and spend money for the "general Welfare" of the United States.

187.    Incident to the spending power, "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). However, there are limitations on Congress' power. First, any conditions imposed must be identified "unambiguously" so "States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207–11; *accord Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Second, the conditions must not be coercive. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012). And third, the conditions must be related to the federal interest in the program. *Dole*, 483 U.S. at 207.

188.    Defendants violate the Spending Clause because they withdraw Federal education dollars based on ambiguous obligations to eliminate diversity, equity, and inclusion programs, instruction, and curriculum, which neither the President nor ED has ever defined. *Id.*

189.    Defendants' actions impose new funding conditions that are unmoored from statute.

190.    Defendants also impermissibly place retroactive conditions on funds. *See Pennhurst*, 451 U.S. at 25 ("Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with postacceptance or 'retroactive' conditions."). Defendants are threatening to withdraw and/or withdrawing funding in the middle of the school year, and long after the SEAs and LEAs provided assurances of compliance with Title VI.

191.    Defendants' actions are also unconstitutionally coercive. By conditioning funding on signing a document that sets forth the administration's viewpoint that "certain" diversity, equity,

and inclusion "practices" are "illegal" (without further explaining what those "practices" might be), Defendants "cross[] the line distinguishing encouragement from coercion." *Sebelius*, 567 U.S. at 579 (citation omitted).  The April 3 Agency Action specifically threatens the loss of Title I and IDEA funding, the largest and most critical streams of K-12 aid, targeted specifically to serve low-income students and close achievement gaps and support students with disabilities.  The funding at stake is *billions of dollars*.

192.    Plaintiffs are left with an impossible choice: either certify compliance with an ambiguous and unconstitutional federal directive—threatening to chill policies, programs, and speech—or risk losing indispensable funds that serve their most vulnerable student populations.

193.    The Supreme Court "has long recognized that ambiguous meanings cause citizens to 'steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.'"  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests*., 455 U.S. 489, 494 n.6 (1982) (ellipsis omitted) (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1982)).

194.    Defendants' actions further violate the Spending Clause by imposing conditions unrelated—and even antithetical—to the funding's purpose.  "[T]he imposition of conditions under the spending power" must be "germane" or "related" to the purpose of federal funding.  *Dole*, 483 U.S. at 208–09 & n.3 (1987).

195.    Title I was enacted specifically to "provide all children significant opportunity to receive a fair, *equitable*, and high-quality education, and to close educational achievement gaps."  20 U.S.C. § 6301 (emphasis added).  The IDEA was enacted to help provide equity and inclusion for students with disabilities.

196.    Moreover, the ESEA, as amended by ESSA, bars ED from dictating the substance of educational programming, curriculum, and instruction.  *See* 20 U.S.C. § 6575 ("Nothing in this

subchapter shall be construed to authorize an officer or employee of the Federal Government to mandate, direct, or control a State, local educational agency, or school's specific instructional content, academic achievement standards and assessments, curriculum, or program of instruction.").

197.    Defendants have nevertheless conditioned funding on Plaintiff States signing a document that calls the legality of any "diversity," "equity," and "inclusion" programming, curriculum, and instruction into question.

198.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that ED unconstitutionally violates constitutional limits on the spending power through the April 3 Agency Action.

199.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing any implementation by Defendants of the April 3 Agency Action or any similar unlawful Agency Action, by any other name, to implement the Presidential Directive.

**COUNT IX**
**Equitable *Ultra Vires***
{As against all Defendants}

200.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

201.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).  Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

202.    Defendants have no authority under Title VI or any other statutes to use federal funding to coerce Plaintiffs into abandoning diversity, equity, and inclusion programs, curriculum, and instruction that are lawful under current law.

203.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that ED acted *ultra vires* through its implementation of the April 3 Agency Action.

204.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing any implementation by Defendants of the April 3 Agency Action or any similar unlawful Agency Action, by any other name, to implement the Presidential Directive.

## RELIEF REQUESTED

Plaintiff States respectfully request that this Court:

a.    Declare, pursuant to 28 U.S.C. § 2201, that ED's April 3 Agency Action is unlawful;

b.    Declare, pursuant to 28 U.S.C. § 2201, that ED's April 3 Agency Action is null and void, such that Plaintiffs absorb no duty to investigate, impede, or report any conduct by any LEA;

c.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside the April 3 Agency Action;

d.    Preliminarily and permanently enjoin Defendants and their employees, agents, contractors, successors, and assigns from implementing the April 3 Agency Action or any similar unlawful Agency Action, by any other name, to implement the Presidential Directive against Plaintiff States;

e.    Award fees and costs as appropriate; and

f.    Grant any other relief the Court deems necessary and appropriate.

Respectfully submitted,

**LETITIA JAMES**
Attorney General
State of New York

By: */s/ Monica Hanna*
Monica Hanna*
Rabia Muqaddam*
*Special Counsels*
Sandra Park*
*Civil Rights Bureau Chief*
Sandra Pullman*
*Senior Counsel*
Alex Finkelstein*
Wil Handley*
Kathryn Meyer*
*Assistant Attorneys General*
Office of the New York State Attorney General
28 Liberty Street
New York, New York 10005
(212) 416-8227
monica.hanna@ag.ny.gov

*Counsel for the State of New York*

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Karyn L. Bass Ehler*
Karyn L. Bass Ehler*
Assistant Chief Deputy Attorney General
Darren Kinkead*
Public Interest Counsel
Elizabeth H. Jordan*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. Lasalle Street
Chicago, IL 60603
312-814-3000
Karyn.BassEhler@ilag.gov
Darren.Kinkead@ilag.gov
Elizabeth.Jordan@ilag.gov

*Counsel for the State of Illinois*

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

By: /s/ Adelaide Pagano
Adelaide Pagano (BBO #690518)
*Assistant Attorney General*
Yael Shavit (BBO #695333)
*Chief, Consumer Protection Division*
One Ashburton Pl.
Boston, MA 02108
(617) 963-2122
adelaide.pagano@mass.gov
yael.shavit@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**ROB BONTA**
Attorney General
State of California

By: */s/ James Richardson*
James Richardson*
*Deputy Attorney General*
Laura L. Faer*
William H. Downer*
*Supervising Deputy Attorneys General*
Andrew Edelstein*
Annabelle Wilmott*
*Deputy Attorneys General*
Michael L. Newman*
*Senior Assistant Attorney General*
300 South Spring Street
Los Angeles, CA  90013
(213) 269-6698
Laura.Faer@doj.ca.gov
William.Downer@doj.ca.gov
James.Richardson@doj.ca.gov
Andrew.Edelstein@doj.ca.gov
Annabelle.Wilmott@doj.ca.gov
Michael.Newman@doj.ca.gov

*Counsel for the State of California*

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Liz Kramer*
Liz Kramer*
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Counsel for the State of Minnesota*

**PHILIP J. WEISER**
Attorney General of Colorado

By: /s/ David Moskowitz
David Moskowitz*
Deputy Solicitor General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Darren Cunningham*
Darren Cunningham*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Darren.cunningham@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Ian R. Liston*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov

*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
Solicitor General 425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for State of Hawaii*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ James C. Luh*
James C. Luh*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us

*Counsel for State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
BreAnna Listermann*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
ListermannB@michigan.gov

*Counsel for the People of the State of Michigan*

**MATTHEW J. PLATKIN**
  Attorney General of New Jersey

*/s/ Farng-Yi D. Foo*
Farng-Yi D. Foo*
Jennifer Lerman*
  *Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Farng-Yi.Foo@law.njoag.gov

*Counsel for the State of New Jersey*

**AARON D. FORD**
Attorney General

By: */s/ Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)*
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ James W. Grayson___*
James W. Grayson*
Chief Deputy Attorney General
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
jgrayson@nmdoj.gov

*Counsel for the State of Hawaii*

**DAN RAYFIELD**
Attorney General of Oregon

By: /s *Christina L. Beatty-Walters**
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Tina.BeattyWalters@doj.oregon.gov

*Counsel for the State of Oregon*


**CHARITY R. CLARK**
Attorney General of Vermont

By: /s/ Jonathan T. Rose
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Jordan G. Mickman*
Jordan G. Mickman (RI Bar No. 9761)*
Chief, Civil and Community Rights Unit
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2079
jmickman@riag.ri.gov

*Counsel for the State of Rhode Island*


**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ Lucy Wolf*
LUCY WOLF, WSBA #59028*
SPENCER W. COATES, WSBA #49683*
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(360) 709-6470
Lucy.Wolf@atg.wa.gov
Spencer.Coates@atg.wa.gov

*Counsel for the State of Washington*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/Rachel L. Bachhuber*
RACHEL L. BACHHUBER*
Assistant Attorney General
WI State Bar #1052533
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0188
bachhuberrl@doj.state.wi.us

*Counsel for the State of Wisconsin*

*\*Pending pro hac vice applications to be filed.*